1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7

8

9   NARVIEZ V. ALEXANDER,                )        3:10-cv-00429-RCJ-WGC
                                         )
10          Plaintiff,                   )        **REPORT AND RECOMMENDATION**
                                         )        **OF U.S. MAGISTRATE JUDGE**
11      vs.                              )
                                         )
12   STATE OF NEVADA, *et al.*,          )
                                         )
13                                       )
            Defendants.                  )
14   _____ )

15          This Report and Recommendation is made to the Honorable Robert C. Jones, Chief United States

16   District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

17   section 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

18          Currently before the court are three (3) motions:

19          1. Defendants State of Nevada *et al*.'s Motion for Summary Judgment (Doc. # 58).[1] Plaintiff

20   Narviez V. Alexander opposed (Doc. # 63) and Defendants replied (Doc. # 64);

21          2. Alexander's Cross-Motion for Partial Summary Judgment (Doc. # 62). Defendants opposed

22   (Doc. # 65) and Alexander replied (Doc. # 67); and

23          3. Defendants' Partial Motion to Strike (Doc. # 70), which Alexander opposed (Doc. # 73).

24          After a thorough review, the court recommends Defendants' motion should be granted,

25   Alexander's cross-motion should be denied as moot, and Defendants' partial motion to strike be denied

26   as moot.

27

28

_____

[1] Refers to the court's docket number.

**I. BACKGROUND**

Plaintiff Narviez V. Alexander, a *pro se* litigant in the custody of the Nevada Department of Corrections ("NDOC"), brings this action pursuant to 42 U.S.C. section 1983. (Pl.'s Am. Compl. (Doc. # 8) at 1.) He is currently housed at Northern Nevada Correctional Center ("NNCC") (Doc. # 71), but this litigation arises from events that took place while he was housed at High Desert State Prison ("HDSP") in Las Vegas, Nevada. (Doc. # 8 at 1.) Defendants are Isidro Baca, Robert Bannister, Bebe Clark, Greg Cox, Joseph Hanson, Bob Hartman, Cole Morrow, Dwight Neven and Howard Skolnick (collectively "Defendants," unless referred to individually or otherwise noted). (*Id.* at 2-8.)

Of Alexander's original ten (10) claims alleged in his Amended Complaint (Doc. # 8), only Counts VI and VII survived screening. (Screening Ord. (Doc. # 9) at 2, 8-9, 16.) In Count VI, Alexander alleges Defendants violated his Eighth Amendment rights because they acted with deliberate indifference to his serious medical need involving dental care. (Doc. # 8 at 31-33.) Alexander asserts Defendants caused him to wait sixty-five (65) days for pain medication or antibiotics to treat an abscess that resulted from a decayed tooth. (*Id.* at 31-32.) He alleges the abscess caused extreme pain, swelling, headaches and stomachaches. (*Id*. at 31-33.) According to Alexander, the tooth was decayed approximately one year before the abscess formed and, due to the decay at that time, the tooth required a filling. (*Id.* at 31.) But the treating dentist, Dr. Hanson, told Alexander he did not perform fillings and Alexander would have to wait for the tooth to decay further so it could be extracted. (*Id*. at 31.) Alexander claims he was told HDSP had a policy of performing extractions only. (*Id*. at 32.)

In Count VII, Alexander alleges Defendants acted with deliberate indifference to his serious medical need when they failed to provide proper treatment for an ear infection in his left ear. (*Id.* at 34-37.) He claims he reported a suspected ear infection after suffering a painful and swollen left ear. (*Id*. at 34.) Thereafter, he saw a nurse (Defendant Clark) who thought it was a fungal infection, but Alexander was never referred to a doctor or given antibiotics. (*Id*. at 35-36.) Alexander alleges he continued to experience pain for sixty (60) days until the infection was purged, but not before it caused damage to his ear. (*Id*. at 37.) During this time, he was never given pain killers. (*Id.*)

The parties now move for summary judgment, respectively. Defendants argue: (1) Alexander has

1   not alleged in Count VI that Defendants Baca, Bannister, Cox, Hartman, Neven and Skolnick, through

2   their own actions, violated the Constitution; (2) Alexander fails to show Defendant Hanson acted with

3   deliberate indifference in Count VI; and (3) Alexander fails to show Defendant Clark acted with

4   deliberate indifference in Count VII.[2] (Doc. # 58.)

5       Conversely, in his cross-motion for summary judgment, Alexander argues his tooth condition

6   constituted a "serious dental need . . ." particularly because of the sixty-five (65) day delay in treatment.

7   (Doc. # 62 at 6-7.) He also argues the Defendants acted with deliberate indifference because they knew

8   his tooth was decaying but, despite his pain, they advised him further tooth decay was necessary for him

9   to be eligible for treatment. (*Id*. at 7-8.)

10                              **II. STANDARD OF REVIEW**

11      "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to

12  the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric*., 18 F.3d 1468, 1471 (9th

13  Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re*

14  *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

15  (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on

16  file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

17  is entitled to judgment as a matter of law." *Id*. (quoting FED. R. CIV. P. 56(c)). Where reasonable minds

18  could differ on the material facts at issue, however, summary judgment is not appropriate. *See Liberty*

19  *Lobby*, 477 U.S. at 250.

20      The moving party bears the burden of informing the court of the basis for its motion, together

21  with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,

22  477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only

23  evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for

24  summary judgment. FED. R. CIV. P. 56(c).

25

26      [2] Evidently, Defendants offer no arguments in defense of Defendant Morrow's conduct. Morrow's name is absent
    from the body of Defendants' motion. This error, however, is likely immaterial because, as explained more fully below,
27  Morrow's role appears to have been related to Alexander's claim of supervisory conduct, which the court ultimately
    concludes is moot.

28                                      3

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Liberty Lobby*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.  Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac.  Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal quotations and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond

4

1   the assertions and allegations of the pleadings and set forth specific facts by producing competent

2   evidence that shows a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.

3   At summary judgment, a court's function is not to weigh the evidence and determine the truth

4   but to determine whether there is a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 249. While the

5   evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor,"

6   if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary

7   judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

8   ### III. DISCUSSION

9   The court will first address Defendants' motion for summary judgment. In doing so, the court

10   will begin with Alexander's allegations against Dr. Hanson in Count VI. Integrated into this discussion

11   will be the court's related analysis of Alexander's cross-motion for summary judgment, which only

12   pertains to the allegations in Count VI.

13   Next, the court will turn to Alexander's allegations against Defendant Clark in Count VII.

14   Integrated into this discussion will be the court's analysis of Defendants' partial motion to strike (Doc.

15   # 70), which only pertains to Count VII.

16   Finally, the court will address Alexander's request to obtain further discovery–a request

17   contained in his opposition to Defendants' motion for summary judgment.

18   **A. Count VI: Defendant Hanson's Deliberate Indifference**

19   ***1. Alexander's Allegations***

20   In his amended complaint, Alexander alleges Dr. Hanson violated his constitutional right to be

21   free from cruel and unusual punishment by forcing him "to wait more than 65 days to see a Dentist

22   before receiving any pain medication or antibiotics for the abcess which had resulted from a rotted,

23   decayed wisdom tooth." (Doc. # 8 at 31.) As a result of this delay, Alexander claims he suffered "intense

24   headaches, a swollen gumline, jawline and stomachaches . . . ." (*Id*.)

25   According to Alexander, he had consulted Dr. Hanson on a previous but unspecified occasion

26   (approximately one year prior) and requested restoration (cleaning and filling) of the tooth so that it

27   could be saved. (*Id*.) But Alexander claims Dr. Hanson told him HDSP does not do cleanings or fillings,

28

1  and that Alexander "would have to wait for the tooth to rot so it could be extracted." (*Id.*) (However,

2  Alexander admits to having received fillings in prison prior to 2008. (*See* Doc. # 62 at 12.))

3       Additionally, Alexander avers Dr. Hanson performed the tooth extraction improperly by

4  "ripping" the tooth out of his mouth. (*Id.* at 33.) He further alleges Dr. Hanson provided him with

5  insufficient post-extraction pain medication and that Dr. Hanson failed to order a follow-up visit. (*Id.*)

6       ### *2. Summary of Evidence*

7       According to Alexander's medical records, he was examined on March 5, 2008. (Doc. # 59-1,

8  Ex. C at 4.) The notes of that examination indicate he was advised of "dental decay subgingival. Any

9  other problems or discomfort [Alexander] advised that *tooth would have to be extracted due to non*

10 *restorability.*" (*Id.*) (Emphasis added.) Alexander's medical records appear to indicate he "refused" tooth

11 extraction on November 14, 2008.[3] (*Id.*) Dr. Hanson attaches to his reply brief a document entitled

12 "Release of Liability for Refusal of Medical Treatment." (Doc. # 64-1, Ex. B at 6.) This release is dated

13 November 14, 2008, and it bears Alexander's signature. (*Id.*) It does not refer to any specific

14 examination, treatment or testing. (*Id.*) But Dr. Hanson alleges it signifies Alexander's decision not to

15 have the subject tooth extracted as was recommended. (Doc. # 58 at 9; Doc. # 58-1, Ex. B at 11-12 ¶ 7.)

16      On January 28, 2010, Alexander submitted a request to HDSP personnel, wherein he grieved:

17 "For the last five weeks I have been suffering from recurring daily headaches. I need to see the doctor."

18 (Doc. # 63, Ex. B-1 at 43.) The response to this request indicated that an appointment was scheduled for

19 "MD." (*Id.*)

20      On February 17, 2010, Alexander submitted a kite to HDSP's dental department. (*Id.* at 32.) In

21 this kite, he stated: "I have an abcess on the right side of my mouth that's draining into my stomach

22 which is causing my stomach to hurt, head to ache and my jawline hurts. I need to see the Dentist

23 A.S.A.P." (Doc. # 63, Ex. A1 at 30.) The March 2, 2010 response to this kite reads, "Working as fast

24 as we are able." (*Id.*) The response further states, "When your name comes up on the list we'll see you."

26      [3] The "November 14, 2008" date is slightly difficult to discern. The "1" in the "14" is faint, which makes the date

27 look like "November 4, 2008." However, viewing the evidence as a whole, and as explained more below, the court concludes the date on this entry in Alexander's medical file is November 14, 2008.

28                                        6

1 (Doc. # 59-1, Ex. E at 13.)  According to Alexander, HDSP personnel took no further action. (Doc. # 63,

2 Ex. A1 at 30.)

3       On March 16, 2010, Alexander filed an Emergency Grievance, in which he requested medical

4 attention. (Doc. # 63, Ex. A2 at 32.) This emergency grievance reads in its entirety:

5       My right side wisdom tooth is bleeding, the abcess is swollen and I need this tooth
      pulled. My jaw hurts, I'm experiencing headaches, stomach aches; and my left year is in
6       pain as well. I need to see the Dentist and the Doctor. I need pain medication badly. I
      can't eat, sleep or exercise without experiencing heavy pain. I have shown my puffy jaw,
7       swollen face and ear to staff and the nurses and nobody has done anything but told me
      to wait till I'm seen. REMEDY SOUGHT: I need to see a Doctor now!"

8

9 (*Id.*) The response to this emergency grievance says, "Not an emergency will refer to medical based upon

10 the officers observations." (*Id.*)

11       Contrary to Dr. Hanson's contention that Alexander "submitted one kite to see a dentist which

12 was on February 17, 2010 . . ." (Doc. # 58 at 8), Alexander filed another kite on April 3, 2010,  in which

13 he grieved: "This is my second request to see the Dentist to deal with this painful toothache. I am sure

14 that the abcess has drained, yet the bone under my right ear is in constant pain." (Doc. # 8 at 32; Doc.

15 # 63, Ex. A3 at 34.) The response to this kite is indecipherable. Ultimately, on April 20, 2010,

16 Dr. Hanson examined Alexander and extracted his tooth. (Doc. # 8 at 33; Doc. # 58 at 8; Doc. # 62 at 7.)

17 On April 30, 2010, Alexander was prescribed ibuprofen for a "toothache." (Doc. # 59-1, Ex. G at 31.)

18       ***3. The Parties' Positions***

19       In his motion for summary judgment, Dr. Hanson challenges Alexander's claim regarding

20 HDSP's policy of performing only cleanings and fillings. (Doc. # 58 at 8.) Dr. Hanson asserts

21 Alexander's claim is "untrue . . . ." (*Id.*) In his declaration, Dr. Hanson states "in the normal and routine

22 course of business, fillings, surgery, extractions and removable prosthetics and other procedures allowed

23 by NDOC Administrative Regulations are conducted on a case by case basis depending on the need of

24 the individual." (Doc. # 58-1, Ex. B at 12 ¶ 8.) Dr. Hanson notes Alexander should be aware that HDSP

25 does fillings because Alexander himself allegedly has had five restorations (also known as fillings) while

26 at HDSP. (Doc. # 58 at 9; Doc. # 58-1, Ex. B at 11 ¶ 6.) Dr. Hanson argues Alexander's own treatment

27 history belies Alexander's contention that NDOC does not do "fillings." (Doc. # 58 at 8-9.) In fact,

28                               7

1   Alexander essentially concedes this point. "The Plaintiff does admit that prior to 2008, he has had

2   fillings, and recently in 2011, he received fillings from a dentist at Ely State Prison." (Doc. # 62 at 12.)

3        Dr. Hanson also contends NDOC policy does not require the tooth to "rot" before it will be

4   treated. (Doc. # 58 at 9.) He asserts "teeth are cared for differently depending on the circumstances, for

5   example, in this matter Plaintiff's tooth was too far decayed to restore." (*Id.*) (Citations omitted.) As

6   discussed above, Dr. Hanson notes Alexander was advised to have his tooth extracted in 2008, well

7   before Alexander began complaining about the pain, but Alexander refused the recommended treatment,

8   i.e., the extraction. (*Id*; see Doc. # 58-1, Ex. B at 11-12 ¶ 7, Ex. D at 15 ¶ 6.) Further, in response to

9   Alexander's claims regarding the extraction, the post-surgery pain medication, and follow-up visit,

10   Dr. Hanson argues:

11        The tooth was surgically removed using a due diligence and care. After the procedure,
     Plaintiff was prescribed a three-day pain medication supply which is standard and follow

12        up visits are scheduled if the difficulty of the procedure warrants it or if the patient
     requests it. In this case, Plaintiff did not request a follow-up visit.

13   (*Id.*)

14        Ultimately, Dr. Hanson contends he did not act with deliberate indifference because the decision

15   to extract rather than restore the tooth was a mere difference in opinion regarding the best course of

16   medical treatment. (*Id.*) He argues that, given the condition of Alexander's tooth, extraction was the only

17   option and sixty-five (65) days was not a substantial or unreasonable delay. (*Id.*)The decision to proceed

18   with the extraction in 2010 was the same recommendation made in 2008. Dr. Hanson argues that had

19   Alexander followed the recommended course of action proposed in 2008, Alexander would not have

20   experienced the tooth pain in 2010. (Doc. # 58-1 at 12 ¶ 7.)

21        In his opposition brief, Alexander rejects Dr. Hanson's "difference in opinion" argument. He

22   contends "this was a complete denial of an examination, pain medication, antibiotics, or, any form of

23   treatment prior to extraction of . . . [Alexander's] painfully infected wisdom tooth." (Doc. # 62 at 10)

24   (Citation omitted.) Alexander claims he "was not seen, examined, or provided with pain medication until

25   April 20, 2010," despite his numerous kites and grievances. (*Id.* at 11.)

26        Further, Alexander argues Dr. Hanson has failed to produce evidence that the extraction and its

27   delay was a difference of opinion. (*Id.* at 12.) Alexander argues Dr. Hanson "ha[s] failed to produce a

28   8

1    signed waiver from 2008 that declares that the Plaintiff refused to have his tooth removed . . . ." (*Id*.)

2        In his Reply, Dr. Hanson concedes that Alexander also filed a kite on April 3, 2010. (Doc. # 64

3    at 3, 6.) (Initially, Dr. Hanson contended Alexander submitted only one kite to see a dentist.) But he

4    maintains the analysis on summary judgment remains the same as this kite "does not create any issue

5    of material fact." (Doc. # 64 at 3, 6.) Dr. Hanson contends this kite is "unrelated" to his conduct and that

6    the kite creates no dispute "as to when Plaintiff first kited regarding his tooth and when the tooth was

7    in fact extracted." (*Id*. at 3.)

8        ***4. Legal Standard***

9        In the recent case of *Akhtar v. Mesa*, --- F.3d ---, 2012 WL 5383038 (9th Cir. Nov. 5, 2012), the

10   Ninth Circuit reiterated the two-pronged test for evaluating a claim for deliberate indifference to a

11   serious medical need. Quoting *Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006), the court explained:

12        First, the plaintiff must show a serious medical need by demonstrating that failure to treat
         a prisoner's condition could result in further significant injury or the unnecessary and
13        wanton infliction of pain. Second, the plaintiff must show the defendant's response to the
         need was deliberately indifferent. This second prong . . . is satisfied by showing (a) a
14        purposeful act or failure to respond to a prisoner's pain or possible medical need and (b)
         harm caused by the indifference.
15
16   2012 WL 5383038 at *9 (citation omitted).

17       Deliberate indifference is only present when a prison official "knows of and disregards an

18   excessive risk to inmate health or safety; the official must both be aware of the facts which the inference

19   could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

20   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *accord Clement v. Gomez*, 298 F.3d 898, 904 (9th

21   Cir. 2002).

22       "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they

23   deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior

24   physician for reasons unrelated to the medical needs of the prisoner. *Hunt v. Dental Dep't.*, 865 F.2d

25   198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving

26   medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury.

27   *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds by WMX Tech., Inc. v.*

28                                                      9

*Miller*, 104 F.3d. 1133 (9th Cir. 1997); *see Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam) (delay in treatment must lead to further injury to support a claim of deliberate indifference).

In addition, a prison physician is not deliberately indifferent to an inmate's serious medical need when the physician prescribes a different method of treatment than that requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights). A difference of opinion concerning appropriate medical care–either between a physician and the prisoner, or between medical professionals–does not amount to deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *see Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a prisoner-patient and medical staff regarding treatment is not cognizable under section 1983). For a difference of opinion to amount to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Snow*, 681 F.3d at 988 (internal quotations and citation omitted).

"The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillan*, 503 U.S. 1, 6 (1992)). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt*, 865 F.2d at 200.

### 5. Analysis

Dr. Hanson does not contest the seriousness of Alexander's alleged medical need. The court's analysis, therefore, will evaluate only the deliberate indifference prong of Alexander's claim.

First, HDSP dental personnel advised Alexander in 2008 that his tooth needed to be extracted

due to decay, and Alexander's medical records appear to indicate he refused the tooth extraction. Although the notes in Alexander's medical file do not specifically state he refused the tooth extraction, the noted refusal immediately follows the extraction advice in his file. Reading these sequential notations in context, the court concludes there is no genuine issue of material fact that the November 14, 2008 refusal noted in Alexander's file relates to the advice regarding tooth extraction in the immediately preceding entry. The court finds further support for this conclusion in the release of liability attached to Dr. Hanson's reply brief. Though deficient as to what specific event(s) it is referring to, the release bears the same November 14, 2008 date as the refusal noted in Alexander's medical file. Accordingly, the evidence supports the reasonable conclusion that Alexander refused a recommended tooth extraction in 2008.

This conclusion is important to the outcome of this case. After extraction was recommended to him, Alexander waited nearly *two years* to request treatment, and once he requested treatment, the parties agree he received it within approximately two months. Given Alexander's initial refusal of tooth extraction and the subsequent two years that passed until he submitted a kite requesting treatment for that tooth, the two-month wait of which he complains does not constitute an "excessive risk" to his health. *See Gomez*, 298 F.3d at 904.

Furthermore, Alexander's tooth was sufficiently decayed in 2008 to prompt dental personnel to recommend extraction. The dental notes from that 2008 examination refer to the tooth's "non restorability." (Doc. # 59-1, Ex. C at 4.) In light of his tooth's all but lifeless condition, any argument that the two-month delay in treatment during 2010 led to further injury is unpersuasive. *See Shapley*, 766 F.2d at 407 (delay in treatment must lead to further injury to support a claim of deliberate indifference).

Even if the court considers Alexander's abscess a "further injury," nothing in the record supports a finding that this additional ailment resulted from Dr. Hanson's deliberate indifference. Alexander wanted his tooth restored, but Dr. Hanson believed the tooth's severity of decay precluded restoration and that extraction was the most appropriate course of treatment. Dr. Hanson had a difference in opinion with Alexander as to the appropriate course of treatment. *Snow*, 681 F.3d at 987 (citing *Sanchez*, *supra*, 891 F.2d at 242). Even assuming *arguendo* Alexander met with Dr. Hanson sometime in 2009 and that

he notified Dr. Hanson of the abscess, Alexander–by his own admission–requested a *filling or restoration*, not extraction, at that time. (*See* Doc. # 8 at 31.) But as Dr. Hanson states in his declaration, "in this matter, Alexander's tooth was too far decayed to restore." (Doc. # 58-1, Ex. B at 11.) Thus, due to the condition of his tooth, Alexander's treatment request in 2009 (filling or restoration) simply conflicted with Dr. Hanson's medical opinion. Because Alexander had previously refused a tooth extraction, Dr. Hanson was not left with many options other than doing nothing, which is exactly what he did until Alexander sought the inevitable treatment in 2010.

No genuine issue exists as to these facts, and these facts do not support a finding that Alexander's abscess and subsequent pain in 2010 resulted from Dr. Hanson's disregard for his condition. Rather, the facts show Dr. Hanson believed extraction was appropriate. He rejected the course of treatment Alexander wanted him to pursue (restorative cleanings and fillings) because he believed such options were medically improper. This amounted to a difference in opinion regarding the best course of treatment for Alexander's tooth, which is markedly different from a "conscious disregard of an excessive risk" to Alexander's health or a medically unacceptable course of treatment. *Snow*, 681 F.3d at 988 (internal quotations and citation omitted).

As soon as Alexander advised HDSP medical personnel that his tooth condition was painful and needed emergency treatment, Dr. Hanson removed the tooth within approximately two months. Dr. Hanson performed this procedure in accordance with NDOC Administrative Regulation ("AR") 631.01, section 1.3.3, which sets forth the method of assessing and treating emergency and non-emergency inmate-patients. (*See* Doc. # 58-1, Ex. A at 7; Doc. # 58 at 9.) Dr. Hanson made a professional dental judgment that extraction was not an emergency, and he scheduled Alexander's extraction under the priority system outlined in AR 631.01. (Doc. # 58 at 9.) The court finds this decision made pursuant to a medical (dental) opinion or judgment does not constitute deliberate indifference. Furthermore, Dr. Hanson's decision to extract the tooth based on its condition was also recommended by another dentist in 2008 (*see* Doc. # 58-1, Ex. B at 11), which demonstrated some uniformity regarding the most acceptable course of dental treatment for Alexander's tooth.

Additionally, whether Dr. Hanson denied Alexander a follow-up visit, or whether Dr. Hanson

12

provided insufficient post-surgery pain medication, is immaterial. The symptoms and pain on which Alexander focuses in his claim occurred during the sixty-five (65) days *preceding* surgical tooth extraction. Also, Alexander has failed to set forth specific facts demonstrating that Dr. Hanson improperly extracted his tooth. Nothing in the record shows Alexander has suffered any post-surgery complications from the procedure. William Donnelly, M.D., a NDOC physician who examined Alexander on March 30, 2012, states in his declaration that based on his examination, "there does not appear to be any permanent damage due to any dental issues such as a tooth abscess." (Doc. # 58-1, Ex. I at 27; Doc. # 59-1, Ex. G at 33.)

Accordingly, Dr. Hanson has met his burden of demonstrating the absence of a genuine issue of material fact regarding whether he acted with deliberate indifference to Alexander's serious dental need. More specifically, the court concludes he did not act with deliberate indifference. The burden now shifts to Alexander to set forth specific facts showing a genuine issue in this regard. *See Matsushita*, 475 U.S. at 586. Alexander has failed to do so. The record shows that as soon as Dr. Hanson was aware of Alexander's interest in appropriate dental treatment, Dr. Hanson provided that treatment within a reasonable time. Therefore, the court recommends Defendants' motion for summary judgment should be **granted** on this claim (Count VI).

As a result of this recommendation, the court also recommends summary judgment should be **granted** in Defendants' favor on Alexander's allegations in Count VI concerning the supervisory liability of Defendants Baca, Bannister, Cox, Hartman, Neven and Skolnick.[4] If there is no constitutional deprivation, it logically follows that there can be no supervisory liability arising therefrom. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for the *constitutional violations* of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.") (emphasis added).

### 6. Alexander's Cross-Motion for Partial Summary Judgment

As mentioned previously, Alexander also filed a cross-motion for partial summary judgment

---

[4] As a consequence of this decision, the court need not address the legal consequences of Alexander's failure to amend his amended complaint with respect to the allegations in Count VI pertaining to these defendants.

(Doc. # 62). With regard to Count VI and the conduct of Defendants (except Clark) alleged therein, he contends summary judgment in his favor is appropriate. (*Id*. at 2-8.) He asserts "the undisputed material facts and attached exhibits clearly demonstrate that the Defendants 'knew' about the risk of harm and arbitrarily ignored it for more than sixty-five (65) days, thereby causing the Plaintiff to suffer from pain and infection, in violation of [previously cited case law]." (*Id*. at 8.)

In light of the court's analysis of the record set forth above, the court finds Alexander's contentions in his cross-motion for partial summary judgment are either unsupported or contradicted by the record. Dr. Hanson has shown that no genuine issue of material fact exists regarding whether he acted with deliberate indifference to Alexander's serious dental need. Thus, the court recommends Alexander's cross-motion for partial summary judgment (Doc. # 62) should be **denied** as moot.

**B. Count VI: Defendant Clark's Deliberate Indifference**

### *1. Alexander's Allegations*

In this claim, Alexander alleges Defendant Clark (and other Doe defendants whom he still has not named) acted with deliberate indifference to a purported infection in his left ear. (Doc. # 8 at 34.) At all relevant times, Clark was a Correctional Nurse III at HDSP. (Doc. # 58-1, Ex. H at 23.)

Alexander claims that in January of 2010, he had been experiencing minor headaches for the preceding five weeks. (*Id.* at 35.) Then, in February of 2010, he began experiencing swelling, pain, and puffiness in his lymph node behind his left ear and jaw, his headaches intensified and his inner ear canal began to ache. (*Id.*)

Alexander filed an Emergency Grievance on February 9, 2010, and he was seen by Defendant Clark, a HDSP nurse, on February 10, 2010. (*Id.*) At this examination, Alexander alleges Clark "never checked his temperature . . . never examined his lymph nodes, never examined his nasal pathways, ignored the obvious puffy jaw, never took his blood pressure, never requested a CBC (blood test), and deliberately denied . . . [Alexander]'s request to see the Doctor." (*Id.*) According to Alexander, Clark's examination consisted of a brief look into his left ear whereupon she told him he "probably had a fungal infection and that the doctor would probably prescribe some antibiotics." (*Id.* at 36)

Alexander alleges that approximately two days later, he received "an appointment notice to see

14

the Doctor on February 16," but he was never seen and his appointment slip disappeared. (*Id.*) Then, Alexander sent a medical kite on February 23, 2010, wherein he requested antibiotics in lieu of a doctor's visit. (*Id.*) But before hearing a response, he filed another Emergency Grievance requesting to be seen by a doctor due to the "intense pain." (*Id.* at 37.) He claims he was "duly ignored." (*Id.*)

On February 27, 2010, Alexander alleges the Defendants responded to his February 23, 2010 kite and "informed the Plaintiff that no antibiotics were ever ordered." (*Id.*) Alexander also claims a "fourth request" for medical attention filed on March 7, 2010, was also ignored. (*Id.*)

Ultimately, Alexander's alleged ear infection was purged in early April of 2010, but not before his left eardrum allegedly suffered "irreparable damage." (*Id.*) He claims Clark's deliberate indifference caused this damage because she prevented him from seeing a doctor. (*Id.*)

### *2. Summary of Evidence*

Before Clark examined Alexander on February 10, 2010, Alexander notified medical personnel of his alleged ailments. As mentioned previously, on January 28, 2010, Alexander submitted a kite, wherein he stated: "For the last five weeks, I have been suffering from recurring daily headaches. I need to see the doctor." (Doc. # 63, Ex. B-1 at 43.) The HDSP's February 7, 2010 response indicates an appointment was scheduled for "MD" on "February 10, 2010." (*Id.*; Doc. # 59-1, Ex. E at 10.)

On February 5, 2010, Alexander submitted another kite, wherein he grieved: "I got an ear infection in my left ear again and I need to see the doctor immediately. Also, my left lymph node is extremely swollen and painful." (Doc. # 63, Ex. B-2 at 45.) The undated response indicates a "MD Appointment" was scheduled and "rescheduled" for "on your clinic days."[5] (*Id.*; Doc. # 59-1, Ex. E at 11.)

On February 9, 2010, Alexander filed an Emergency Grievance, which reads in its entirety as follows:

I have an ear infection and a painful headache. I was supposed to see medical today (2/9/10) but instead the unit officer has concluded that I can wait till next week. An ear

---

[5] The HDSP's response further states: "He was not seen by the Dr. . . . [and] the kites were filed in his chart. . . . [Please] schedule grievance." (Doc. # 59-1, Ex. E at 11.) The response is somewhat unintelligible, but is not necessarily determinative of the outcome herein.

infection not treated could render me permanently deaf. I need to see medical today as scheduled. My medical file represents that I have recurring ear infections.

(*Id.*, Ex. B-3 at 47.) The response issued the same day states: "Medical schedules visits not custody – Non emergent – will schedule." (*Id.*) An "Appointment Slip" shows Alexander was scheduled for an appointment in the medical department for February 16, 2010. (*Id.*, Ex. B-4 at 49.)

As mentioned above, Clark examined Alexander on February 10, 2010. (*Id.*, Ex. B-5 at 51; Doc. # 59-1, Ex. G at 41.) Clark's progress notes from that examination indicate she examined Alexander's left ear where she found "wax" and a "reddened canal . . . ." (Doc. # 59-1, Ex. G at 41.) In contrast to Alexander's assertions, Clark made no mention in the records of a fungal infection. (*See id.*; *see also* Doc. # 58-1, Ex. F at 18.) Alexander's medical records show on February 11, 2011, a NDOC physician prescribed "Debrox" (liquid drops for ear wax removal) and scheduled a follow-up appointment for the following week. (Doc. # 59-1, Ex. G at 30.)

Alexander submitted a third kite on February 23, 2010. (Doc. # 63, Ex. B-5 at 51.) The entire kite reads as follows: "On 2-10-10, I was seen for an ear infection by a nurse. Why have I not received my antibiotics? I have been in pain since I first kited. I don't need to see another doctor just send my antibiotics!" (*Id.*) The February 27, 2010 response reads, in pertinent part: "Eardrops ordered from pharmacy 2.11.10. . . . [T]hese eardrops that the Doctor ordered are not antibiotics. You have no antibiotics ordered." (*Id.*)

Alexander filed a second Emergency Grievance on February 25, 2010, wherein he stated:

Prison officials are denying me the appropriate medication/antibiotics to deal with the ear infection I have. Instead of seeing a doctor I was forced to see a nurse and was not prescribed the appropriate antibiotics to deal with my fungal infection in my ear. I was seen by this nurse two weeks ago and still haven't seen a doctor or received the required antibiotics (2-10-10).

(*Id.* at 52.) The response issued the same day states: "This grievance will be forwarded to the medical dept for resolution." (*Id.*)

Finally, on March 7, 2010, Alexander submitted a fourth kite stating: "On 2-10-10, I was seen by a nurse for an ear infection and mistreated. As a result, the left side of my face is numb and puffy. I need to see a doctor immediately." (*Id.* at 53.) The undated and unsigned response indicates that an

16

1   appointment was scheduled for "MD." (*Id.*)

2        *3. The Parties' Positions*

3        In her declaration, Clark states that she "do[es] not have any specific recollection regarding

4   Mr. Alexander or the events alleged by Mr. Alexander." (Doc. # 58, Ex. H at 23.) She admits that she

5   examined him on February 10, 2010. (Doc. # 58 at 12.) Clark, however, contests Alexander's allegation

6   that she improperly examined him. (*Id.*)

7        Clark argues that "as a professional medical provider, [she] was able to determine by Plaintiff's

8   physical appearance that he was not likely running a fever." (*Id.*) She further contends that based upon

9   Alexander's complaint of an ear infection, his "blood pressure, blood work and checking his nasal

10  passageways were not necessary in making a diagnosis." (*Id.* at 12-13.) While Clark does not specifically

11  recollect her examination of Alexander, she states hypothetically that if a patient presented her with the

12  symptoms Alexander claims to have had at the examination, she "would not determine . . . that an

13  infection was present. . . . [and she] would dispense ear wax softening drops to possibly solve the

14  discomfort . . . ." (Doc. # 58-1, Ex. H at 24.)

15       In addition, Clark asserts she was not deliberately indifferent for failing to prescribe antibiotics

16  to Alexander because "[c]orrectional nurses are not allowed to prescribe antibiotics . . . ." (Doc. # 58

17  at 13; *see* Doc. # 58-1, Ex. H at 23, Ex. F at 19.) Such prescriptions, she contends, are "under the

18  authority of the treating physician . . . ." (*Id.*) She further claims that she explained her prescription

19  limitations to Alexander. (Doc. # 58 at 13.) Clark also asserts that she does not deny any inmate-patient

20  access to a physician, and that if the matter appeared urgent, then she would try to make the appointment

21  a priority. (Doc. # 58-1, Ex. H at 24.) Ultimately, Clark argues Alexander "does not allege any facts that

22  show Defendant Clark had conscious disregard for Plaintiff's health." (Doc. # 58 at 13.)

23       In his opposition, Alexander re-alleges that Clark improperly examined him. (Doc. # 62 at 14.)

24  He also alleges that although Clark knew about his ear infection, she "failed to review . . . [his] medical

25  file, and . . . failed to investigate further or permit the Plaintiff to see a licensed physician for further

26  analysis or treatment." (*Id.*) (Citation omitted.)

27  / / /

28                                             17

1      **4. Analysis**

2         The court refers to the legal standards set forth above in Section III.A.4 of this Report and

3 Recommendation.

4         A large portion of Alexander's allegations and much of the evidence he submits to support his

5 claim does not pertain to Clark. The only evidence in the record pertaining to Clark shows she examined

6 Alexander once on February 10, 2010.

7         The court's review of the record, including the supporting declarations provided by Defendants,

8 shows NDOC nurses like Clark do not have the authority to prescribe antibiotics. (*See* Doc. # 58-1, Ex. F

9 at 19, Ex. H at 23.) Consequently, Clark was not legally obligated to prescribe antibiotics to Alexander;

10 in fact, pursuant to prison policy, she was legally *prohibited* from doing so. Such conduct, therefore,

11 provides no basis for Clark's liability. Clark did not do anything, or fail to do something, that she was

12 legally required to do.

13         Further, the record shows a HDSP physician prescribed Alexander drops for earwax removal on

14 February 11, 2010, *one day after* Clark examined him. This evidence belies Alexander's allegations that

15 Clark deliberately denied or prevented Alexander's access to a doctor. Finally, Dr. Donnelly's notes from

16 a recent March 30, 2012 examination contradict Alexander's claim of "irreparable damage" to his left

17 ear. Dr. Donnelly's notes indicate Alexander's left ear canal was "clear" with "minimal wax formation,"

18 and that his left ear drum was "normal." (Doc. # 58-1, Ex. G at 33.)

19         As a result, it is the opinion of the court that Nurse Clark did not act with deliberate indifference.

20 The record shows she did not "disregard an excessive risk" to Alexander's health. *See Farmer*, 511 U.S.

21 at 837; *Gomez*, 298 F.3d at 904. Clark, therefore, has met her burden on summary judgment of

22 demonstrating the absence of a genuine issue of material fact regarding her deliberate indifference.

23         Once again, the burden now shifts to Alexander to set forth specific facts demonstrating a

24 genuine issue of fact. *See Matsushita*, 475 U.S. at 586. Upon close review of the evidence submitted

25 with Alexander's opposition, the court finds no credible evidence that would raise a genuine issue of

26 material fact regarding Clark's deliberate indifference. His allegations directed at Clark are either

27 unsupported or contradicted by the record. In any event, Alexander's opposition focuses more on various

28

other NDOC medical personnel as he makes general allegations about being denied antibiotics and doctor visits. However, Alexander does not name any of these NDOC medical staff members as defendants.

Accordingly, the court recommends that Defendants' motion for summary judgment should be **granted** on this claim (Count VII). Consistent with the court's handling of Count VI above, as a result of this recommendation, the court also recommends summary judgment should be **granted** in Defendants' favor on Alexander's allegations in Count VII concerning the supervisory liability of Defendants Baca, Bannister, Cox, Hartman, Neven and Skolnick. *See Taylor*, 880 F.2d at 1045 ("A supervisor is only liable for the *constitutional violations* of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.") (emphasis added).

### *5. Defendants' Partial Motion to Strike*

In this motion, Defendants seek to strike roughly two pages of Alexander's reply brief (Doc. # 67) on the grounds that it improperly includes a sur-reply. (Doc. # 70 at 1.) In ruling on Defendants' motion for summary judgment, the court has not relied on any of the allegations Defendants seek to strike. Therefore, Defendants' motion to strike is **denied** as moot. *See, e.g., Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F.Supp.2d 1095, 1109-10 (C.D. Cal. 2006).

### C. Alexander's Request to Obtain Discovery

This court issued a Report and Recommendation in March of 2012 (Doc. # 55), which was adopted by the district judge (Doc. # 66). The March Report and Recommendation granted in part and denied in part Defendant's Motion to Dismiss filed on October 11, 2011 (Doc. # 48). One relevant consequence of those rulings was that Alexander was granted leave to amend the allegations in Count VII against Defendants (except Clark) involving supervisory liability. (Doc. # 66 at 2.) Specifically, the court advised Alexander to amend his amended complaint to set forth allegations more akin to the specific allegations averred by the plaintiff in the recent Ninth Circuit case *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). (Doc. # 55 at 11.)

As of the date of this Report and Recommendation, Alexander has failed to amend his amended

complaint. However, in his opposition brief he requests leave to obtain discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure ("FRCP")[6] in order to "amend either count or present the necessary specific policies to oppose this claim . . . ."[7] (Doc. # 62 at 9.) He alleges the court has prevented him from conducting any discovery because "a scheduling order has yet to issue." (Doc. # 67 at 2.)

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d) (paragraph spacing deleted). Alexander is correct that no discovery has been permitted due to the absence of a scheduling order entered by the court.  No scheduling order was entered herein under Local Rule 16-1(b) because Defendants never answered Alexander's amended complaint; instead, Defendants filed a motion to dismiss (Doc. # 48) and thereafter a motion for summary judgment (Doc. # 58).

The court might be amenable to granting Alexander's request for leave to obtain discovery, but Alexander fails to specify the discovery he seeks to obtain and how that discovery would preclude summary judgment. Typically, a motion under FRCP 56(d) requires (1) description of the discovery the movant wants to undertake; (2) an explanation how that discovery would preclude entry of summary judgment; and (3) an explanation why discovery could not have been obtained earlier. *See*, *e.g.*, *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010); *see also Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001) (The party seeking discovery bears the burden of proffering "sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment.") (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 920 (9th Cir. 1996)). Although the absence of a LR 16-1

---

[6] The amendments to FRCP 56 effective December 1, 2010, moved the provisions of subdivision (f) to subdivision (d), without substantial change. *Compare* FED. R. CIV. P. 56(f) (2009), *with* FED. R. CIV. P. 56(d) (2010); *see* FED. R. CIV. P. 56(d) (advisory committee notes regarding 2010 Amendments). Construing Alexander's allegations liberally, as the court must (*see Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988)), the court will presume Alexander intended to cite FRCP 56(d).

[7] He also requests denial of Defendants' motion for summary judgment on these grounds. (Doc. # 62 at 9.)

scheduling order probably relieved Alexander of the third requirement, the absence of any explanation of how the proposed discovery would supposedly preclude summary judgment herein (the second requirement) prevents a finding of good cause to grant Alexander's request.

In addition, Alexander appears to request leave to obtain discovery regarding the *policies* of medical and dental care. (*See* Doc. # 62 at 9.) At first glance, this request seems to satisfy the first requirement above. However, Alexander still fails to explain *how* this discovery would be relevant to his claim. Defendants have provided the relevant AR that governs dental care. (*See* Doc. # 58-1, Ex. A at 7.) Defendants also have provided the declarations of Dr. Hanson and Dr. John C. Shepphird, DMD, a Senior Institutional Dentist with NDOC. (*Id*. at Exs. B, D.) These declarations indicate Alexander was advised in 2008 to have his tooth extracted, that Alexander refused extraction, and that Alexander's tooth was properly extracted when he sought dental attention in 2010. (*See id*.) Further, Defendants have provided the declarations of Nurse Clark, Donald Poag, Director of Nursing Services I with NDOC, and Dr. Donnelly. (Doc. # 58-1, Exs. F, H, I.) These declarations indicate Nurse Clark examined Alexander and found no fungal infection, that the next day a physician prescribed Alexander earwax loosening drops, and that Alexander's ear appeared normal in March of 2012.[8] (*See id*.)

In any event, the policies of medical or dental care appear relevant only for Alexander's allegations regarding supervisory liability, which the court previously rendered moot upon a finding that no underlying constitutional violation was committed. Even construing Alexander's request for discovery liberally, he does not seek discovery pertaining to *Dr. Hanson's* or *Nurse Clark's* conduct, or anything related to the underlying constitutional violation. Accordingly, the court recommends Alexander's request to obtain discovery should be **denied**.

/ / /

/ / /

---

[8] The court previously determined the treatment Dr. Hanson provided Alexander for his tooth and the treatment Nurse Clark provided for his ear did *not* deprive him of a constitutional right. This would be true even if Dr. Hanson's or Nurse Clark's conduct was performed pursuant to a prison policy, or if their conduct might have contravened a prison policy. In light of the absence of a constitutional deprivation, any specific medical or dental policy of NDOC has no relevance to Alexander's claims in either Count VI or Count VII.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order:

1.     **GRANTING** Defendants' Motion for Summary Judgment (Doc. # 58);

2.     **DENYING** Alexander's Cross-Motion for Partial Summary Judgment (Doc. # 62); and

3.     **DENYING** Alexander's request to obtain discovery.

The parties should be aware of the following:

1.     They may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Judge.

2.     This Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, should not be filed until entry of the District Judge's judgment.

DATED: November 9, 2012.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

22